IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DANNY TEVAGA, )
)
          Petitioner, )    No C 04-2452 JSW (PR)
)
    vs. )    ORDER DENYING PETITION
)    FOR A WRIT OF HABEAS
JOE MCGRATH, Warden, )    CORPUS
)
          Respondent. )
————————————————— )

## INTRODUCTION

Danny Tevaga, a prisoner of the State of California currently incarcerated at Salinas Valley State Prison, has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This Court ordered Respondent to show cause as to why five claims raised in the petition should not be granted. Respondent filed an answer, a memorandum of points and authorities in support thereof, and exhibits. Petitioner did not file a traverse. This order denies the petition for writ of habeas corpus on the merits.

## PROCEDURAL BACKGROUND

The parties agree on the following procedural history: on December 15, 1999, a jury in the Superior Court of the State of California, Santa Clara County, found Petitioner guilty of first-degree murder with the special circumstance of being an accomplice to robbery. The jury found true an enhancement that the robbery-murder was committed for the benefit of, at the direction of, or in

association with a criminal street gang.  On March 9, 2000, the trial court sentenced Petitioner to a term of 25 years-to-life in state prison, with the possibility of parole.  Petitioner appealed to the California Court of Appeal, Sixth District, which affirmed the conviction in an unpublished, reasoned opinion filed on September 26, 2003.  On December 23, 2003, the California Supreme Court denied a petition for review.  On June 21, 2004, Petitioner filed his first petition for a writ of habeas corpus in this Court.  On October 27, 2004, this Court dismissed the petition for failure to state a cognizable claim for federal habeas relief, but granted leave to amend.  On November 29, 2004, Petitioner filed the instant amended petition.

## STATEMENT OF THE FACTS

Petitioner was tried with co-defendants Falala Lelei and Christian Valdes. The jury found all three defendants guilty of the first-degree murder of Herbert Kay, a NASA scientist who lived in Palo Alto, California, with his wife and twin daughters. The facts of the case are summarized from the California Court of Appeal opinion as follows:

**A. The Murder**

On June 12, 1997, Jonathan S. graduated from Ronald McNair Intermediate School (the school) in East Palo Alto. Later that day, Jonathan, his brother Usupo S., Valdes, Tevaga, Lelei, Simanu, Malone and Jeff Tito, and Tapuloa met at the school to play basketball and drink. There was conflicting testimony concerning whether anyone talked about committing a robbery. However, Usupo told a police officer that there was discussion about a robbery. Malone also testified that he heard Simanu talk about something at the school, and, as a result, he wanted to leave the group.

They played basketball and drank for a few hours until it started to get dark. Then everyone left in Valdes' Isuzu Rodeo. There was conflicting testimony about who was with Valdes in the Rodeo at any one time. However, it is undisputed that Valdes drove Malone, Jeff, and Jonathan home and brought Tevaga, Lelei, Simanu, Tapuloa, and Usupo to Buchanon Court in East Palo Alto. There, this smaller group continued to drink and also smoked some

marijuana. Although Usupo and Malone testified that no one talked about wanting to commit a robbery as they drove in the Rodeo or later at Buchanon Court, Malone admitted to police that while riding in the Rodeo, he heard Simanu tell Tevaga that he wanted to rob someone. Usupo also told police that at Buchanon Court, they decided to commit a robbery and planned to drive around and look for a victim. At trial, Usupo said that he lied to police about this.

After a while, Valdes drove everyone to University Avenue in Palo Alto. They continued to drink as they cruised around. At one point, they turned onto a side street and stopped so that some of them could urinate. Usupo testified that he did not see Kay before Valdes parked the Rodeo. However, Simanu told police that he saw Kay before Valdes parked.

After parking, Valdes stayed in the Rodeo, and everyone else got out. Usupo took a foot-long piece of broomstick with him. He testified that after urinating, he dropped the stick and started walking down the street to find the others. He saw Kay coming toward him and heard one of his friends say, "Get him" in Samoan. Usupo approached Kay and punched him in the head, knocking him down. Simanu appeared, and he and Usupo went through Kay's pockets, looking for money. Kay screamed that he did not have any. Simanu took Kay's keys and a hairband. During this time, Tevaga, Lelei, and Tapuloa, joined Usupo and Simanu and punched and kicked Kay. Lelei also beat him with Usupo's broomstick until it broke.

After a while, Usupo said they should go, and he and Tevaga returned to the Rodeo. When the others did not follow, they walked to the corner, called for them, and went back to the Rodeo. No one came, so they went to get the others. Simanu and Lelei were still kicking Kay. Usupo and Tevaga told everyone to leave, and Tapuloa followed them. Simanu and Lelei stayed behind and dragged Kay from the street, hiding him behind a bench. There, they continued to kick him for a while. Before leaving, Simanu stepped on Kay's chest. He and Lelei then joined the others. At one point, Simanu saw a police car and threw the items he had taken into a trash bin. Valdes then drove everyone away from the area.

Kay died from massive head, face, and neck trauma caused by multiple, overlapping blunt force injuries that broke bones and cartilage in his face, skull, and neck, crushed his larynx, and caused his brain to swell. There was little or no evidence of serious injury to his lower chest and body.

Later that night, Malone was on the sidewalk in front of his friend Wayne Selu's garage and saw Tevaga. Malone asked about spots on Tevaga's shoes, jeans, and shirt. Tevaga said they were blood. He explained that they had robbed somebody in Palo Alto, and he had kicked the victim and could not stop.

3

The next morning, Selu saw Valdes, Lelei, and Simanu outside Lelei's house. There was blood on Simanu's and Lelei's clothing, and one of them said they had attacked a white guy. Lelei mentioned using a stick.

Either that night or the next night, David Jimenez overheard Tevaga talking to someone at a movie theater. Tevaga said that "they tried robbing somebody or they jumped somebody" and "they don't even know if they killed him or not."

The following Sunday, Selu saw Tevaga at church, and Tevaga told him "he'd been involved in beating somebody up and it got pretty messy." He said they had gone too far, and he was sorry.

After their arrests, defendants gave statements to the police. Lelei admitted kicking Kay a few times and hitting him in the mouth once. He said that someone else had used a broomstick. He explained that Kay was already unconscious, so there was no use beating him more if he was not going to feel the pain. Later, he helped hide Kay's body.

Valdes admitted driving the Rodeo to the scene but said he stayed inside.

Tevaga said he was drunk the night of the incident and could not remember much of what happened. He then claimed full responsibility for the incident, saying he was the only one to harm Kay. He said there was no reason to attack Kay and did not realize he was going to kill him. Later, however, Tevaga told police that he and others were at a playground drinking and decided to go to Palo Alto. They parked to relieve themselves, and later someone hit Kay. Tevaga joined the others and kicked Kay in the chest and head. After a while, he advised everyone to leave before the police came. He said he then ran back to the Rodeo and could not remember anything that happened after that.

**B. The Defense**

There was evidence that defendants drank a lot of malt liquor and smoked marijuana before the murder. Dr. Stephen Pittel testified as an expert concerning the effects of alcohol and drugs on a person. Given the body weights of Tevaga and Lelei, the amounts of alcohol and marijuana they said they consumed, and the time frame in which they did so, Pittel opined that their blood alcohol levels would put a person in a "confusional," if not stuporous, state. He testified that increased intoxication decreases a person's ability to make good judgments, accurately perceive what is happening, and consider alternate courses of conduct. A person in a "confusional" state of intoxication manifests the following symptoms: "Disorientation and mental confusion; dizziness, exaggerated emotional states, exaggerated emotional reactions, or

4

acting upon those states; great mood swings or emotional instability; disturbances of sensations, like double vision; disturbances of perception; decreased pain sets; impaired balance and muscular coordination and staggering gait and slurred speech." He opined that such a person would lack rational thought.

*People v. Falala Lelei, et al.*, No. H021125, 2003 Cal. App. Unpub. LEXIS 9267, at *2-10 (Cal. Ct. App. Sep. 26, 2003) (footnotes omitted).

## **STANDARD OF REVIEW**

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under the 'contrary to' clause, a federal habeas court may grant the writ if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if a state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. As summarized by the Ninth Circuit: "A state court's decision

can involve an 'unreasonable application' of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000) *overruled on other grounds*, *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003) (citing *Williams*, 529 U.S. at 405-07).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must not only be erroneous, but objectively unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

In deciding whether a state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of the Petitioner's claim in a reasoned decision.  *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Where the state court gives no reasoned explanation of its decision on a Petitioner's federal claim and there is no reasoned lower court decision on the claim, a federal habeas court should conduct an independent review of the record.  *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings of the Supreme Court as of the time of the

6

state court decision. *Williams* 529 U.S. at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). While the circuit law may be "persuasive authority" for the purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Id*.

In his petition for writ of habeas corpus, Petitioner asserts five claims for relief: (1) the trial court violated Petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments by not allowing certain cross-examination of witness Sivao; (2) the trial court violated Petitioner's rights under the Fifth, Sixth, and Fourteenth Amendment by admitting evidence of an alleged co-conspirator's confession; (3) the trial court violated Petitioner's rights under the Fifth and Fourteenth Amendments by admitting an involuntarily-made confession in evidence against Petitioner; (4) the trial court violated Petitioner's right to due process by failing to instruct the jury on the lesser-included offense of involuntary manslaughter; and (5) the trial court committed cumulative error, in violation of Petitioner's right to due process.

## **DISCUSSION**

### 1.  **Exclusion of Sivao's Testimony**

Petitioner claims that the trial court violated his rights under the Fifth, Sixth, and Fourteenth Amendment by preventing him from asking witness Jonathan Sivao certain questions during cross-examination. The claim is without merit.

Undisputed testimony during the trial indicated that Christian Valdes transported Jonathan Sivao, Malone Tito, and Jeff Tito to their respective homes

in his Isuzu Rodeo after the larger group finished drinking and playing basketball at Sivao's school. *People v. Falala Lelei, et al.*, 2003 Cal. App. Unpub. LEXIS 9267, at *4. The testimony was disputed as to whether other individuals, including Iapesa Simanu and Petitioner, were in the Rodeo with Sivao during this trip. After Sivao took the stand, defense counsel asked him if he heard anyone in the Rodeo discuss a robbery. *Id.* The prosecution objected, arguing that this line of questioning called for hearsay. *Id.* The defense suggested that Sivao would testify that he did not hear anyone in the Rodeo discuss a robbery and thus the line of questioning could not, by definition, elicit hearsay. *Id.* The defense noted that Sivao's testimony would serve to impeach Tito Malone's earlier testimony that, while in the Rodeo, he heard Simanu tell Petitioner he wanted to rob someone. *Id.* The trial court sided with the prosecution and rejected defense counsel's argument that Sivao's testimony could be impeaching, noting that Sivao could not remember whether Simanu was in the Rodeo or not. *Id.*

On appeal, the California Court of Appeal concluded that the trial court erred in preventing Sivao from answering whether he heard anyone in the Rodeo discuss a robbery. The court rejected the prosecution's argument that the excluded testimony was irrelevant and noted that

> Jonathan [Sivao] conceded that Simanu could have been in the Rodeo, and Usupo S. previously testified that Simanu was in the Rodeo along with him, Jonathan, and others. Thus, evidence that Jonathan did not hear Simanu talk about a robbery in the Rodeo has some tendency, circumstantially, to prove that Simanu did not do so.

*Id.* at *36.

The court concluded, however, that the trial court's error was harmless because "the potential probative value for purposes of impeachment was limited." *Id.* First, the court noted that

8

To achieve impeachment, the defense had to place Jonathan, Malone, Simanu, and Tevaga in the Rodeo at the same time. However, Jonathan testified that Malone was in the Rodeo, but he could not remember whether Simanu was there and did not even suggest that Tevaga might have been there too. And although Usupo said that Simanu was in the Rodeo, he contradicted Jonathan's testimony that Malone was there.

*Id.* at *36-37. Next, the court concluded that Sivao's testimony would not definitively establish that Simanu did not tell Petitioner he wanted to rob someone, only that Sivao did not hear such a comment. Thus, the court felt Sivao's testimony was "circumstantial evidence" that supported two inferences, either that Simanu did not make the comment or that Sivao simply did not hear it. *Id.* at *37.

The court also felt the "conflicting and confusing" testimony about who was in the Rodeo, and when, limited the potential impeachment value of Sivao's testimony. *Id.* The court noted that Sivao testified that Valdes needed more than one trip to transport the entire group from the school to Buchanon Court, while Malone testified Valdes only made one trip but later suggested on cross-examination that Valdes made more than one trip. *Id.*

Next, the court suggested that Petitioner and his co-defendants could still impeach Malone's testimony because Usupo had testified that he, Simanu, Sivao, and others were in the Rodeo but that Malone and Jeff Tito were not. *Id.* Usupo's testimony thus contradicted Malone's testimony that he heard Simanu make a comment to Petitioner about a robbery. *Id.* Usupo also testified that he did not hear anyone in the Rodeo talk about committing a robbery. Thus, the court concluded, "Usupo provided the sort of impeachment testimony counsel sough to elicit from Jonathan [Sivao]." *Id.* at *38.

Finally, the court noted that, even if Sivao's testimony was admitted to

impeach Malone, other evidence suggested Petitioner and his confederates discussed and planned the robbery beforehand. *Id.* Usupo testified that someone talked about committing a robbery while the group was drinking and playing basketball at the school. *Id.* Usupo also testified that at Buchanon Court later that evening, he, Simanu, Lelei, Tapuloa, Valdes, and Petitioner planned to drive around and look for a victim to rob. *Id.*

Given these factors, the court concluded that it was not "reasonably probable the jury would have returned a verdict more favorable to any defendant had the court permitted Jonathan [Sivao] to say he did not hear anyone in the Rodeo talk about robbing someone." *Id.* Because the trial court's error in excluding Sivao's testimony was harmless, the court denied Petitioner's claim.

**A.    Legal Standard**

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985), *cert. denied*, 478 U.S. 1021 (1986).

"State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes v. South Carolina*, 126 S. Ct. 1727, 1731 (2006) (internal quotation marks and citations omitted). This latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. *See id.* "While the Constitution [] prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that

10

are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 1732; *see Egelhoff*, 518 U.S. at 42 (holding that the exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.").

Similarly, the Confrontation Clause does not prevent a trial judge from imposing reasonable limits on cross-examination based on concerns of harassment, prejudice, confusion of issues, witness safety or interrogation that is repetitive or only marginally relevant. *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). A trial court's limitation on cross-examination does not violate the Confrontation Clause unless it limits relevant testimony, prejudices the defendant, and leaves the jury without sufficient information to evaluate the biases and motivation of the witness. *See United States v. Bridgeforth*, 441 F.3d 864, 868 (9th Cir. 2006).

In order to obtain habeas relief on the basis of a trial court's evidentiary error, Petitioner must show that the error was one of constitutional dimension and that it was not harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). He would have to show that the error had "'a substantial and injurious effect' on the verdict.'" *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting *Brecht*, 507 U.S. at 623).

## B.    Analysis

The California Court of Appeal's determination that the trial court committed a harmless error under state law in preventing Sivao from answering certain questions was not contrary to, nor an unreasonable application of,

controlling federal law.  Petitioner is not entitled to federal habeas relief on this claim.

The Court of Appeal's conclusion that the trial court erred in its application of California's evidence code does not necessarily give rise to a federal due process violation.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (noting that habeas is unavailable for violations of state law or for alleged error in the interpretation or application of state law); *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995).  Even if we assume that the trial court's misapplication of state law deprived Petitioner of due process and was thus of constitutional dimension, furthermore, the error did not have a "substantial and injurious" effect on the verdict and thus was harmless within the meaning of *Brecht*.  *See Brecht*, 507 U.S. at 623.

In its analysis of harmless error, the Court of Appeal did not apply *Brecht* but rather cited *People v. Watson*, 46 Cal. 2d 818 (1956), where the California Supreme Court described a similar test: "a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." *Id.* at 836.  The state court's reasoning that a different verdict was not reasonably probable but for the trial court's error informs the *Brecht* analysis.

As the Court of Appeal noted, Sivao's proposed testimony was of only limited impeachment value.  Sivao could not remember whether Simanu was in the Rodeo and never suggested that Petitioner was in the car.  Sivao did testify that Tito Malone was in the car, but that account contradicted Usupo's testimony that Malone was not in the car.  There was also conflicting testimony as to how many trips Valdes needed to transport the entire group between the school and

Buchanon Court. The conflicting and varied accounts of who was in the Rodeo with Sivao limits the potential impeachment value of Sivao's testimony that he did not hear anyone in the Rodeo talk about a robbery.

Sivao's testimony, furthermore, would not have definitely established that Simanu did not tell Petitioner he wanted to rob someone. Rather, the jury could have concluded Simanu made the comment but that Sivao did not hear it, or did hear it but had since forgotten it. The value of Sivao's excluded testimony is thus limited because the jury could have drawn different inferences from it.

Petitioner and his co-defendants had other avenues available to them to impeach Malone's testimony, even with Sivao's testimony excluded. Usupo testified that Malone was not in the Rodeo with him, Simanu, and Petitioner. He also testified that no one in Rodeo spoke of committing a robbery. This testimony directly contradicted Malone's testimony that he heard Simanu make a comment to Petitioner in the car. Usupo thus provided the type of impeachment content that Petitioner sought from Sivao's excluded testimony.

Finally, even if Sivao's testimony had been admitted, other evidence in the record tended to suggest Petitioner and his friends had planned the robbery in advance. Usupo testified that there was discussion of a robbery while the group was still at Sivao's school, well before anyone got into the Rodeo. After Valdes had transported some individuals back to Buchanon Court, furthermore, there was further discussion there of driving around to look for someone to rob.

In sum, the impeachment value of Sivao's testimony was limited by confusing and conflicting accounts as to who was in the Rodeo and the likelihood the jury would draw conflicting inferences from the testimony. Petitioner could still impeach Malone's testimony even after Sivao's testimony was erroneously excluded. And other evidence substantially supported the prosecution's

13

contention that Petitioner and his friends planned the robbery.  It cannot be said that Petitioner has established that the trial court's limitation on this testimony violates some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, *see Egelhoff*, 518 U.S. at 42, or that it prejudiced Petitioner by leaving the jury without sufficient information to evaluate the biases and motivation of the witness, *see Bridgeforth*, 441 F.3d at 868.  Moreover, even if any constitutional error in the trial court's exclusion of Sivao's testimony had been established, it would be harmless under *Brecht*.  *See Brecht*, 507 U.S. at 623.  Because the error did not have a "a substantial and injurious effect" on the jury's verdict, the state courts' denial of Petitioner's claim was neither contrary to, nor an unreasonable application of, controlling federal law and Petitioner is not entitled to federal habeas relief on this claim.  *Id.*

## 2.    <u>Admission of Simanu's Statement</u>

Petitioner claims that the trial court's admission of Simanu's incriminating statement into evidence violated his rights under the Fifth, Sixth, and Fourteenth Amendments to confront witnesses against him and present a defense. Petitioner's claim is without merit.

The trial court allowed Palo Alto Police Officer Scott Wong to relate a redacted version of what Simanu told him during Simanu's custodial interrogation.  *People v. Falala Lelei, et al.*, 2003 Cal. App. Unpub. LEXIS 9267, at *11.  Valdes' defense counsel objected, arguing that allowing this testimony violated the defendants' right to confrontation because Simanu was not present in the courtroom and would not independently testify.  *Id.*  The trial court rejected defense counsel's objection, ruling that the testimony was allowed under the California Evidence Code's hearsay exception for statements against the declarant's pecuniary, proprietary, penal, or social interests.  *Id.*  Wong then

14

related a redacted version of Simanu's statement:

> Simanu said he saw Kay walking on the street before the vehicle stopped. Thereafter, he got out and urinated. Later, he took keys and a hairband from Kay and then moved him from the street to an area behind a bench. As he left, he kicked and stepped on the Kay's chest. When he got back into the vehicle, he saw a police patrol car. He got out, hid, and then threw the items he had taken into a trash bin.

*Id.* The Court of Appeal, citing to *Ohio v. Roberts*, 448 U.S. 56 (1980), concluded that the trial court's admission of Simanu's statement did not violate Petitioner's constitutional rights.  The court began by describing the *Roberts* standard:

> As defendants correctly note, Simanu's statement was properly admitted only if it came within "a firmly rooted hearsay exception" or contained "particularized guarantees of trustworthiness" such that adversarial testing would be expected to add little, if anything, to its reliability. (citations omitted)
>
> We need not determine whether a statement against the declarant's penal interest comes within a firmly rooted hearsay exception because we conclude that Simanu's statement passes muster under the alternative test for reliability: It contains particularized guarantees of trustworthiness.

*Id.* at *13-14.

The court noted that a "genuinely self-inculpatory" statement is itself one of the "particularized guarantees of trustworthiness" that render a statement admissible under the Confrontation Clause.  *Id.* at *15.  The court found that this "guarantee" applied to Simanu's "genuinely self-inculpatory" statement:

> Simanu's statement was highly self-incriminating. It not only placed him at the scene of the crime before, during, and after it occurred but also, and more specifically, established that he saw Kay before the attack, got out of the Rodeo, stole property from Kay, kicked and stepped on him, hid his body, and finally discarded the stolen property.

*Id.* at *16.

15

1    Finally, the court rejected Petitioner's contention that Simanu's statement

2 was presumptively unreliable because Simanu made it during custodial

3 interrogation.  The court noted that any statements Simanu made about *other*

4 defendants may well have been presumptively unreliable in the context of

5 custodial interrogation, because "a suspect has a strong motive to minimize his or

6 her involvement, spread or shift the blame to others, and curry favor with

7 authorities."  *Id.* at \*16-17.  The court reiterated, however, that Simanu's

8 redacted statement only implicated him and made no mention of Petitioner or his

9 co-defendants.  *Id.* at \*17.  The court concluded:

> [W]hatever might be said about the reliability of other parts of
> Simanu's statement that were not admitted below, we do not
> consider the parts that were admitted here presumptively unreliable.
> On the contrary, they were inherently reliable because they dealt
> with only his presence and conduct before, during, and after the
> incident, subjects he knew about first hand; and they were highly
> self-incriminating. Indeed, the particular statement defendants find
> so prejudicial - i.e., that Simanu saw Kay before the vehicle parked
> – prevented Simanu from asserting an alibi defense and increased
> his potential criminal liability because it tended to show that when
> Simanu saw Kay from the Rodeo, he decided to attack and rob him.

*Id.* at \*17-18.

### A.  Legal Standard

    The Confrontation Clause of the Sixth Amendment provides that in

criminal cases the accused has the right to "be confronted with witnesses against

him."  U.S. Const. amend. VI.  The ultimate goal of the Confrontation Clause is

to ensure reliability of evidence, but it is a procedural rather than a substantive

guarantee.  *Crawford v. Washington*, 541 U.S. 36, 61 (2004).  It commands, not

that evidence be reliable, but that reliability be assessed in a particular manner:

by testing in the crucible of cross-examination.  *Id.*  The Clause thus reflects a

judgment, not only about the desirability of reliable evidence, but about how

16

reliability can best be determined.  *Id.* at 61.

The Confrontation Clause applies to all out-of-court testimonial statements offered for the truth of the matter asserted, i.e., "testimonial hearsay."  *See id.* at 51.  While the Supreme Court has not articulated a comprehensive definition of testimonial hearsay, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  *Id.* at 68.

Out-of-court statements by witnesses that are testimonial hearsay are barred under the Confrontation Clause unless (1) the witnesses are unavailable, and (2) the defendants had a prior opportunity to cross-examine the witnesses. *Id.* at 59.  The reliability of such statements, for Confrontation Clause purposes, depends solely upon these two factors.  *See id.* at 68.  Thus, the Court's prior holding in *Roberts*, 448 U.S. at 56, that such statements may be admitted so long as the witness is unavailable and the statements have "adequate indicia of reliability," i.e., fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness," is overruled by *Crawford*.  *See id.*

In *Teague v. Lane*, the Supreme Court held that a federal court may not grant habeas corpus relief to a prisoner based on a constitutional rule of criminal procedure announced after his conviction and sentence became final unless the rule fits within one of two narrow exceptions.  *Teague v. Lane*, 489 U.S. 288, 310-316 (1989).  *Crawford* announced a "new rule" for purposes of *Teague* analysis, and that rule does not come within the exception to the *Teague* non-retroactivity rule for "watershed rules."  *Whorton v. Bockting*, 127 S. Ct. 1173, 1184 (2007) (applying *Teague*, 489 U.S. at 310-316).  *Crawford* therefore does not apply retroactively on collateral attack.  *Id.*

Confrontation Clause claims are subject to harmless error analysis.  *See*

17

*United States v. McClain*, 377 F.3d 219, 222 (2d Cir. 2004) (applying harmless error analysis to claim). In the context of reviewing a state court conviction under 28 U.S.C. § 2254, this means that relief is in order only if the admission at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Bockting v. Bayer*, 399 F.3d 1010, 1022 (9th Cir.), *amended,* 408 F.3d 1127 (9th Cir. 2005) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)), *rev'd on other grounds sub nom.*, *Whorton v. Bockting*, 127 S. Ct. 1173 (2007).

### B.   Analysis

In its analysis of Petitioner's claim, the California Court of Appeal applied the then-controlling *Roberts* standard. After the court's decision, the *Crawford* Court substantially revised the analysis for determining whether the admission of out-of-court statements violates the Confrontation Clause. See *Crawford*, 541 U.S. at 60. *Crawford*, however, announced a "new rule" that does not apply retroactively on habeas review. *See Bockting*, 127 S. Ct. at 1184 (applying *Teague*, 489 U.S. at 310-316). Consequently, the instant claim is governed by the federal law in effect prior to Crawford, under which the admission of a hearsay statement does not violate the Confrontation Clause if it either falls within a "firmly rooted" hearsay exception, or bears "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66- 68; *Idaho v. Wright*, 497 U.S. 805, 816 (1990). The California Court of Appeal concluded that Simanu's statement had particularized guarantees of trustworthiness that rendered it admissible under *Roberts*. The California courts' application of the *Roberts* standard was neither contrary to, nor an unreasonable application of, controlling federal law at the time the decision was rendered. Therefore, Petitioner's claim fails.

Simanu's statement was genuinely "self-inculpatory" and thus bears one of the "particularized guarantees of trustworthiness" that render a statement

18

admissible under *Roberts*.  *See Williamson v. United States*, 512 U.S. 594, 605 (1994) ("the very fact that a statement is genuinely self-inculpatory... is itself one of the 'particularized guarantees of trustworthiness' that makes a statement admissible under the Confrontation Clause.").  Simanu's statement placed him at the scene of the crime before, during, and after the assault on Kay.  He admitted seeing Kay from the Rodeo and stealing property from him later during the assault.  After the first attack, Simanu moved Kay's limp body behind a bench and kicked and stepped on Kay as he left.  After spotting a police car, Simanu then hid and later disposed of the stolen items in a trash bin.

Based on this record, this Court agrees with the California court's assessment that Simanu's statement was "highly self-incriminating."  *People v. Falala Lelei, et al.*, 2003 Cal. App. Unpub. LEXIS 9267, at *16.  The statement placed Simanu at the scene of the crime and implicated him in the assault, robbery, and an effort to cover-up the crime.  Given the highly self-incriminating nature of the statement, adversarial testing through cross-examining would be expected to add little to its reliability.  The trial court properly admitted the "genuinely self-inculpatory" statement and there was no violation of Petitioner's rights under the Confrontation Clause.  *See Roberts*, 448 U.S. at 66-68; *Williamson*, 512 U.S. at 605.[1]

---

[1]   The Court of Appeal, finding that Simanu's statement bore "particularized guarantees of trustworthiness," did not decide whether the California hearsay exception for statements against the declarant's penal interest under which the trial court admitted Simanu's statement was "firmly rooted" for *Roberts* purposes.  In its pre-*Crawford* jurisprudence, the Supreme Court had held that "due to the sweeping scope of the label, the simple categorization of a statement as a "'declaration against penal interest' . . . defines too large a class for meaningful Confrontation Clause analysis."  *Lilly v. Virginia*, 527 U.S. 116, 127 (1999), quoting *Lee v. Illinois*, 476 U.S. 530, 544 n.5 (1986).

As Respondent concedes, Simanu's statement, taken during a custodial interrogation, would almost certainly qualify as inadmissible "testimonial hearsay" under *Crawford* unless Simanu was unavailable to testify at trial and Petitioner had an opportunity to cross-examine him beforehand. *See Crawford*, 541 U.S. at 51. As described above, however, *Crawford* does not apply retroactively and thus affords Petitioner no basis for relief. *See Bockting*, 127 S. Ct. at 1184.

Under both the *Roberts* and *Crawford* standards, furthermore, Petitioner is not entitled to relief unless he shows the trial court's alleged error had a "substantial and injurious effect or influence in determining the jury's verdict." *See McClain*, 377 F.3d at 222; *Bockting*, 399 F.3d at 1022. Even if the trial court had erred in admitting Simanu's statement, Petitioner's claim would fail under this harmless error analysis. The redacted version of Simanu's statement concerned only Simanu's actions and whereabouts and made no reference to Petitioner or other suspects whatsoever. Additionally, there was a substantial amount of other evidence which linked Petitioner to the crime, including Petitioner's own confession to the crime. Based on this evidence, it cannot be said that the admission of Simanu's statement had a substantial and injurious effect.

The Court of Appeal properly applied *Roberts* in concluding that the trial court did not err in admitting Simanu's statement. However, even if the trial court did err in admitting the statement, it cannot be said that the admission had a "substantial and injurious effect or influence in determining the jury's verdict." *Bockting*, 399 F.3d at 1022 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). The state courts' denial of Petitioner's claim was neither was neither contrary to, nor an unreasonable application of, controlling federal law and

Petitioner is not entitled to federal habeas relief on this claim.

### 3.    **Admission of Petitioner's Statement**

Petitioner claims that the police applied "religious coercion" to induce involuntary statements from him during his custodial interrogation, and that the trial court violated his due process rights by admitting those statements into evidence.  Pet. at 6.  Petitioner's claim is without merit.

Following his arrest and at the start of custodial interrogation, Petitioner waived his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and agreed to speak with police detectives Luis Verbera and Mike Denson.  *People v. Falala Lelei, et al.*, 2003 Cal. App. Unpub. LEXIS 9267, at *20.  At the beginning of the interview, Petitioner said he kicked Kay in the chest but was too intoxicated to remember anything else.  *Id.*

Later, after Verbera informed Petitioner that his friends had confessed their roles in the murder, Petitioner said he would "fall for each and every one of them" and claimed that he was the only one who beat and kicked Kay, and that his other friends had stayed in the Rodeo.  *Id.*  Verbera told Petitioner he doubted this story and that he knew Petitioner's friends were involved.  *Id.*  Petitioner said his friends would never "rat" on him.  *Id.* at *21.  Verbera responded that Petitioner's friends were not "ratting" on him but rather "needed to get things off their chests and felt bad for Kay's family."  *Id.*  Verbera said he would be preparing a report for court and Petitioner asked if his friends would also appear in court.  *Id.*  The Court of Appeal reported the ensuing discussion as follows:

> At that point, the following exchange took place:
> "Verbera[:] I, I don't know at, everybody standing side by side or exactly the procedure... They told us what you did, what I, I, I mean, we could go through all the names and what each of them did okay. We're not bullshitting you because you know why? At this point, it's locked in. But I want you, one, to get it off your

chest. Two, to confirm what they're saying is the truth okay. But the first thing that we have to think of for you, are you a Christian? [¶] Tevaga[:] I'm Mormon. [¶] Verbera[:] Oh, you're a Mormon. Okay. *And you guys, you believe in the Ten Commandments.* [¶] Tevaga[:] Yeah I believe, I believe all that stuff. [¶] Verbera[:] Okay, okay. *That's the first thing, is our soul. We have to be, be in peace with our soul. And if [sic] means that we're in peace with our soul, but we have to face the consequences, that's okay.* Because we have to. And you think about your family and how you were raised, right? And what would your father say right now? What would he tell you right now? [¶] Tevaga[:] He would be mad." (Italics added.)

Tevaga then asked to see pictures of his friends, but Verbera told him to wait. Tevaga said, "You know it's hard for me to believe that you know." Verbera replied, "You know what, of course it is. You know why? Because they're your homeboys. Because you said one thing very true, you loved them more than what some of their families did, right? And you would do anything for them. Well they said the same thing and they sat there, big guys like you or smaller guys like you and they cried. And they cried for a few reasons. Because that love they have for the, for the homeboys, that love they have for their own family, the love they have for their church, for God, or for the Lord, and what the, the, the sorrow they felt for having those two girls growing up without a dad. On Father's Day. And that's really sad.... And that's how they felt. Just like you're feeling. And they said okay it's not ratting, but I need to get this off my chest. And if we talk about it, and it makes you feel better, and if you want to write a, a letter of sorry to, to the family we'll let you do that. *Because all that is part of our healing and it's part of our religious belief system to ask the Lord for forgiveness.* Right? Part of the commandment. And we can get it off our chest. We talk about it, is one way. Another way we even write an apology, whatever you want. But we need to go through those steps right now. Because it's for you, it's for you to feel better about yourself... In all honesty on Judgment Day, whether you believe in Judgment Day or not, there's going to be one thing that's going to be looked at. Were you able to ask for forgiveness? Were you able to take this pain out of your soul and at least alleviate it some way, right? ... And if you made a mistake, you made a mistake. You said it yourself. What did you say? You didn't want to kill him, right? [¶] Tevaga[:] Yeah. I didn't want to kill him." (Italics added.)

Thereafter, Verbera suggested that perhaps Tevaga was not looking for some one to kill that night, but instead something just went wrong, he got excited and did not realize what happened. When Tevaga agreed, Verbera asked him to elaborate. Tevaga said he first wanted to hear the taped statements of his friends or at least see their pictures. Verbera said he had to check on the legality of playing the tapes but showed him pictures. After Tevaga saw some

22

pictures, Verbera asked him to start from the beginning. The interrogation continued for another half an hour.

*Id.* at *21-25.

After reviewing the evidence, including a videotape of Petitioner's confession, the Court of Appeal rejected Petitioner's claim that Detective Verbera's religious comments, including those italicized above, amounted to coercion, rendering his confession involuntary and thus inadmissable at trial. The court found that Verbera's religious comments, although questionable, were not "either inherently or actually so coercive as to overcome Tevaga's resistance and become an additional motivating force." *Id.* at *25.  The court noted that the detectives questioned Petitioner for over thirty minutes and that Petitioner "substantially incriminated himself by admitting his presence at the scene and his assaultive conduct towards Kay" before Verbera made any religious comments. *Id.* at *27.

After Verbera made his first religious comment, furthermore, the court observed that:

> Tevaga did not suddenly break down or immediately open up and volunteer new incriminating details about what happened. On the contrary, the videotape reveals no appreciable change in Tevaga's demeanor, general emotional state, or attitude as a result of Verbera's comments.  Indeed, the detectives still had to pre§ Tevaga to elicit a more truthful version of events.

*Id.* at *27-28.  The court "simply disagree[d] with Tevaga's view that Verbera's comments had a visible effect on him." *Id.* at *28.

Given that Petitioner made "substantially incriminating" statements prior to Verbera's religious comments and the visual evidence suggested Petitioner was unmoved by the comments, the court concluded that Verbera's "few and brief" religious remarks did not amount to coercion and denied Petitioner's claim.

23

*Id.*

## A.    Legal Standard

Involuntary confessions in state criminal cases are inadmissible under the Fourteenth Amendment. *Blackburn v. Alabama*, 361 U.S. 199, 207 (1960). The voluntariness of a confession is evaluated by reviewing both the police conduct in extracting the statements and the effect of that conduct on the suspect. *Miller v. Fenton*, 474 U.S. 104, 116 (1985); *Henry v. Kernan*, 197 F.3d 1021, 1026 (9th Cir. 1999). Absent police misconduct causally related to the confession, there is no basis for concluding that a confession was involuntary in violation of the Fourteenth Amendment. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *Norman v. Ducharme*, 871 F.2d 1483, 1487 (9th Cir. 1989), *cert. denied*, 494 U.S. 1031, *and cert. denied*, 494 U.S. 1061 (1990).

To determine the voluntariness of a confession, the court must consider the effect that the totality of the circumstances had upon the will of the defendant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973). "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)).

A confession is only involuntary if the police use coercive activity to undermine the suspect's ability to exercise his free will. *Derrick v. Peterson*, 924 F.2d 813, 818 (9th Cir. 1990), *cert. denied*, 502 U.S. 853 (1991). Encouraging a suspect to tell the truth is not coercion. *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir. 1997). Nor do appeals with religious themes or overtones

necessarily constitute coercion. *See, e.g., United States v. Miller*, 984 F.2d 1028 (9th Cir. 1993) (Mormon defendant's will not overborne when interrogator, a Mormon bishop, described spiritual implications of defendant's crime and reminded him of religious imperative of confessing and making restitution); *Muniz v. Johnson*, 132 F.3d 214 (5th Cir. 1998) (discussion of religion and interrogator's offer to get priest for defendant did not amount to coercion).

Voluntariness of a confession is not a factual issue entitled to a presumption of correctness under 28 U.S.C. § 2254(d), but is a legal question meriting independent consideration in a federal habeas corpus proceeding. *Miller v. Fenton*, 474 U.S. at 116; *Collazo v. Estelle*, 940 F.2d 411, 415 (9th Cir. 1991) (en banc) (federal court not bound by state court finding that confession is voluntary), *cert. denied*, 502 U.S. 1031 (1992). A federal habeas court must review de novo the state court's finding that a confession was voluntarily given. *Derrick v. Peterson*, 924 F.2d at 818.

### B.    Analysis

Having examined the record and viewed the videotape of Petitioner's confession, we conclude Detective Verbera's religious comments were not sufficiently "coercive" such that Petitioner's will was overborne and his confession rendered involuntary. *See Leon Guerrero*, 847 F.2d at 1366. As such the California courts' denial of Petitioner's claim was neither contrary to, nor an unreasonable application of, controlling federal law, and Petitioner's claim fails.

We concur with the Court of Appeal's judgment that Petitioner made deeply self-incriminating statements well before Verbera ever made a religious comment and that the religious comments were not an additional motivating force. At the beginning of the interrogation, Petitioner volunteered that he only

kicked Kay in the chest, but later, in response to Verbera's assertion that his friends had told the police "everything," Petitioner indicated he would take full responsibility for the assault on Kay. *People v. Falala Lelei, et al.*, 2003 Cal. App. Unpub. LEXIS 9267, at *20. The detectives and Petitioner discussed whether Petitioner's friends were "ratting on him," and Detective Denson explained that the friends only "needed to get things off their chests." *Id.* Petitioner inquired whether he would be in court with his "boys." *Id.* Only then, after assuring Petitioner than neither he nor his partner were lying, did Verbera make his first religious comment by inquiring as to Petitioner's religion and referencing the Ten Commandments. *Id.* By this juncture, Petitioner had already substantially incriminated himself by admitting being on the scene and saying that he was the only one to attack and ultimately kill Kay.

During the subsequent conversation, Verbera used a variety of techniques to encourage Petitioner to tell the truth about his role in the crime. Verbera appealed to Petitioner's strong feelings of affection for his friends and family. He assured Petitioner that his friends confessed to the police to alleviate some of their guilt over the murder. Verbera pointed out that Kay's murder had left Kay's twin daughters without a father. The detective explained that he thought Petitioner did not intend to kill Kay and that it was all a mistake, and that perhaps things had gotten out of hand. Verbera asserted that Petitioner would feel better and could alleviate some of his own guilt and suffering if he confessed his role in the crime.

Verbera certainly infused several of his appeals with religious overtones. He asserted that Petitioner should confess and ask forgiveness because that is "part of our religious belief system to ask the Lord for forgiveness." *Id.* at *23. Verbera claimed that on "Judgement Day," whether Petitioner was honest or not

26

is "one thing that's going to be looked at."  *Id.* at *24.  Nonetheless, these religious comments were brief and only a marginal element of Verbera's overall interrogation technique.  Petitioner did not break down or immediately confess following Verbera's religious comments, furthermore, but rather confessed only after the detectives played him a brief recording of Petitioner's co-defendant Falala Lelei speaking with the police, and showed Petitioner pictures of other friends who were also cooperating with the police.

After viewing the videotape of Petitioner's confession, *see* Resp't Ex. 53, this Court concurs with the Court of Appeal's assessment that Verbera's religious comments elicited "no appreciable change in Tevaga's demeanor, general emotional state, or attitude as a result of Vebera's comments."  *Id.* at *27-28.  Petitioner remains generally impassive throughout the interrogation and does not react in any noticeable manner after Verbera makes his religious comments.  His tone is flat and unemotional when he responds to Verbera's questions about his religion and the Ten Commandments.  Indeed, Petitioner appears most animated when the detectives offer to show him pictures of the friends who have purportedly cooperated with the police.

In sum, the evidence in the record, including the videotape, do not support Petitioner's assertion that Verbera's few and brief religious comments rendered his will overborne and motivated his confession.  Rather, the evidence tends to suggest Petitioner confessed only after he was convinced that his friends had also spoken to the police and that he would not be "ratting out" his "boys" by confessing to Verbera.

Having reviewed all the evidence and considered the totality of the circumstances, we conclude that Petitioner has not shown that Verbera or Denson obtained Petitioner's confession "by physical or psychological coercion or by

27

improper inducement so that the suspect's will was overborne." *See Leon Guerrero*, 847 F.2d at 1366.  Petitioner exercised his own free will in confessing his crime.  *See Derrick*, 924 F.2d at 818.  As such the California courts' rejection of Petitioner's claim was neither contrary to, nor an unreasonable application of, controlling federal law, and his claim fails.

### 4.    <u>Refusal to Instruct on Involuntary Manslaughter</u>

Petitioner claims that the trial court violated his Fifth, Sixth, and Fourteenth Amendment rights by declining to instruct the jury on the lesser included offense of involuntary manslaughter.  Petitioner's claim is meritless.

Petitioner presented evidence at trial that he was voluntarily intoxicated at the time of the crime.  *People v. Falala Lelei, et al.*, 2003 Cal. App. Unpub. LEXIS 9267, at *47.  Petitioner claims that his intoxication precluded him from having the specific mental state required for a conviction of murder, Pet. at 8, and as a result, the trial court's refusal to instruct on the lesser included offense of involuntary manslaughter, Petitioner concludes, forced an "all-or-nothing" choice on the jury of convicting on first-degree murder or acquitting Petitioner altogether if they found his intoxication prevented him from forming the requisite mental state.  *Id.*  Petitioner believes this choice favored conviction because the jury was disinclined to excuse him of all culpability for Kay's murder.

In evaluating Petitioner's claim, the Court of Appeal rejected Petitioner's claim on the basis of harmless error, concluding that any "error was harmless because the factual question to be posed by instructions on involuntary manslaughter was resolved against Tevaga and Lelei under other, properly given instructions." *People v. Falala Lelei, et al.*, 2003 Cal. App. Unpub. LEXIS 9267, at *48.  The court noted:

28

The court instructed the jury on, among other things, first degree premeditated murder, first degree robbery felony-murder, second degree murder based on commission of an unlawful act dangerous to life (implied malice), robbery, assault by means of force likely to produce great bodily injury, and aiding and abetting.

The court further instructed the jury that it could consider evidence of voluntary intoxication in determining whether defendants formed the specific intent required for first degree premeditated murder, robbery felony-murder, liability as an aider and abettor, and the gang enhancement. (See CALJIC Nos. 4.21 & 421.2.) The court emphasized that the jury could not convict defendants unless the circumstances not only were consistent with a finding that they possessed the requisite specific intents or mental states but also "cannot be reconciled with any other rational conclusion."

*Id.* at *48-49. In considering the claim, the Court of Appeal also noted that because voluntary intoxication does not negate the general intent required for assault and battery and Petitioner's argument was that because the evidence of Petitioner's commission of the misdemeanor battery coincided with that of the other defendants, the misdemeanor was dangerous, this supported an instruction on misdemeanor involuntary manslaughter. *Id.* at *53. The court noted that battery may be a predicate for involuntary manslaughter, which may be a lesser offense of murder, which occurs when a killing is committed 'in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.' (citation omitted). *Id.* The Court of Appeal then determined

In our view, the jury necessarily resolved the factual question that would have been posed by this theory of involuntary manslaughter by convicting Tevaga of first degree murder and finding true the robbery-murder special circumstance allegation. Simply put, the jury found that he killed during the commission of a felony: robbery. . . . To make such findings, the jury rejected evidence and argument suggesting that Tevaga killed during the commission of a misdemeanor.

*Id.* at 53-54.

The jury convicted Petitioner and his co-defendant on first-degree murder, thus finding that they had formed the requisite specific intent for that offense. *Id.* at *48-49. The jury implicitly rejected Petitioner's defense that voluntary intoxication prevented him from forming the requisite specific intent. *Id.* The Court of Appeal was not persuaded by Petitioner's claim that the jury was faced with an unpalatable "all-or-nothing" choice between convicting on murder or acquitting:

> As noted, the court also instructed the jury on second degree murder based on implied malice. Defendants acknowledge that evidence of voluntary intoxication is not admissible to negate implied malice. (citations omitted)  Thus, even if the jury found that defendants did not form specific intent because they were too intoxicated, it was not faced with an all-or-nothing choice between first degree murder and acquittal, at least concerning Tevaga and Lelei, both of whom admitted joining the others in repeatedly hitting and kicking Kay while he was on the ground. The jury's implicit rejection of second degree murder confirms the integrity and reliability of the jury's finding that defendants acted with the requisite specific intent.

Furthermore, apart from determining guilt, the jury also had to decide the gang allegation. As noted, the jury was permitted to consider the evidence of voluntary intoxication in determining whether each defendant possessed the requisite specific intent to promote their gang. Thus, this allegation also posed essentially the same question that would have been posed by instructions on involuntary manslaughter instructions - i.e., whether or not defendants formed specific intent due to voluntary intoxication. In finding the allegations true, the jury again resolved this issue against each defendant. Moreover, because the allegation did not involve a determination of guilt, it is unlikely the jury might have been tempted to find it true simply to prevent defendants from escaping all liability. Therefore, the gang determination further supports the reliability of jury's findings of intent required for the murder convictions. *Id.* at *51-52.  In sum, the court concluded, "we are satisfied any alleged error in refusing to

30

instruct the jury on involuntary manslaughter as a lesser included offense was harmless, in that we find no reasonable probability that the error affected the outcome." (citations omitted). *Id.* at *56-57.

### A.    Legal Standard

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings. *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment. *See id.* Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury. *See Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir. 1995). Due process does not require that an instruction be given unless the evidence supports it. *See Hopper v. Evans*, 456 U.S. 605, 611 (1982). The omission of an instruction is less likely to be prejudicial than a misstatement of the law. *See Walker v. Endell*, 850 F.2d at 475-76 (citing *Henderson v. Kibbe*, 431 U.S. at 155). Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155).

In general, the failure of a state trial court to instruct on lesser-included offenses in a non-capital case does not present a federal constitutional claim. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *Windham v. Merkle*, 163 F.3d 1092, 1105-06 (9th Cir. 1998); *Turner*, 63 F.3d at 819 (citing *Bashor v. Riley*, 730 F.2d 1228, 1240 (9th Cir.), *cert. denied*, 469 U.S. 838 (1984)). However, "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule." *Solis*, 219 F.3d at 929 (citing *Bashor*, 730 F.2d at 1240). *Solis* suggests that there must be

substantial evidence to warrant the instruction on the lesser included offense.  *See Solis*, 219 F.3d 929-30 (no duty to instruct on voluntary manslaughter as lesser included offense to murder because evidence presented at trial precluded a heat of passion or imperfect self-defense instruction; no duty to instruct on involuntary manslaughter because evidence presented at trial implied malice); *see also Cooper v. Calderon*, 255 F.3d 1104, 1110-11 (9th Cir. 2001) (no duty in death penalty case to instruct on second degree murder as a lesser included offense because the evidence established that the killer had acted with premeditation, so if the jury found that the defendant was the killer, it necessarily would have found that he committed first degree murder).

### B.    Analysis

The Supreme Court has held that the failure to instruct on a lesser-included offense in a capital case is constitutional error if there was evidence to support the instruction.  *See Beck v. Alabama*, 447 U.S. 625, 638 (1980).  However, the Ninth Circuit has held that this holding does not extend to non-capital cases.  *Solis*, 219 F.3d at 929; *Bashor v. Riley*, 730 F.2d 1228, 1240 (9th Cir. 1984).  As such, Petitioner claim for federal habeas relief based on the trial court's failure to instruct on the lesser-included offense of involuntary manslaughter fails.  *See* 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412; *see also Alvarado v. Hill*, 252 F.3d 1066, 1068-69 (9th Cir. 2001) (The question under § 2254(d) "is not whether [the conviction] violates due process as that concept might be extrapolated from the decisions of the Supreme Court. Rather, it is whether [the conviction] violates due process under 'clearly established' federal law, as already determined by the Court.").

The Ninth Circuit has noted, however, that the trial court's failure to give instructions on the defendant's theory of the case may violate due process. *See*

*Solis*, 219 F.3d at 929.  This Court finds that the trial court's failure to provide an instruction on involuntary manslaughter based on a theory of misdemeanor battery did not violate Petitioner's constitutional rights because the evidence presented at trial supported the conviction of murder during the commission of a robbery.  *Id.* at 929-30.

However, even if the trial court erred in failing to provide adequate jury instructions on Petitioner's theory of the case, Petitioner's claim would fail under the requisite harmless error analysis.  *See Brecht*, 507 U.S. at 637 (a habeas petitioner is not entitled to relief for an instructional error unless the error "'had substantial and injurious effect or influence in determining the jury's verdict.'").  As the Court of Appeal noted, Petitioner's contention that the trial court's error left the jury with an all-or-nothing choice between first-degree murder or acquittal is incorrect.  The trial court instructed the jury on second-degree murder based on implied malice, but the jury still chose to convict on first-degree murder, notwithstanding evidence of Petitioner's intoxication.  That the jury convicted on first-degree murder even with the lesser charge of second-degree murder available undermines Petitioner's claim that the trial court's failure to instruct on involuntary manslaughter was prejudicial.  Further, the jury's finding that Petitioner committed the murder during the commission of a felony, robbery, reflects that there was no prejudice in failure to instruct on involuntary manslaughter instruction based on an underlying misdemeanor battery.

The jury's finding on the gang enhancement also confirms their implicit rejection of Petitioner's defense that he did not have the requisite mental state for murder.  The jury was allowed to consider Petitioner's evidence of voluntary intoxication in deciding whether he had the specific intent to promote his gang during the commission of the murder.  In finding the gang enhancement true, the

33

jury resolved that Petitioner's intoxication did not negate his specific intent.

The jury's finding on the gang enhancement also refutes Petitioner's theory that the jury was improperly influenced by an "all-or-nothing" choice before them.  As the Court of Appeal noted, the gang enhancement did not involve a determination of guilt and thus it is unlikely the jury would find the enhancement true simply because they were concerned Petitioner would otherwise escape all criminal liability.  Rather, the jury was more likely to find the enhancement true because they found Petitioner had the required mental state, notwithstanding his intoxication defense.

The jury rejected Petitioner's voluntary intoxication defense in finding him guilty of first-degree murder, with a gang enhancement, and declined to convict instead on the second-degree murder alterative.  Petitioner has not established that the failure to instruct on involuntary manslaughter had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 637.  Therefore, Petitioner's claim fails.

## 5.    **Cumulative Error**

Petitioner claims the cumulative effect of the alleged errors described above deprived him of due process under the Fourteenth Amendment.  Petitioner argues that the trial court's errors "compound and reinforce" each other and that even "if the courts find these errors shown are harmless individually, it should find them cumulatively prejudicial."  Pet. at 9.  Petitioner's claim is meritless.

Petitioner did not raise this claim on direct appeal to the California Court of Appeal, but did raise it in his petition for review in the California Supreme Court.  The California Supreme Court summarily denied Petitioner's claim.

### A.     Legal Standard

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution).

Cumulative error is more likely to be found prejudicial when the government's case is weak.  *See United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *see, e.g., Thomas v. Hubbard*, 273 F.3d 1164, 1180 (9th Cir. 2002) (noting that the only substantial evidence implicating the defendant was the uncorroborated testimony of a person who had both a motive and an opportunity to commit the crime).  However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation.  *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002); *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).

### B.     Analysis

Petitioner has not shown that the trial court's alleged constitutional errors are sufficiently prejudicial to warrant federal relief.  As discussed above, only Petitioner's claim that the trial court erred in admitting Sivao's testimony gives rise to a possible violation of his constitutional rights, and that error was found harmless under *Brecht*.  By definition, a single harmless error alone doesn't rise to the level of a "cumulative" error.  In any event, the government's case against Petitioner was very strong and it cannot be said that the exclusion of Sivao's testimony sufficiently prejudiced Petitioner's defense such that reversal is

necessary.  *See Frederick*, 78 F.3d at 1381.

The California Supreme Court's summary denial of Petitioner's claim was neither contrary to, nor an unreasonable application of, controlling federal law, and his claim for habeas relief fails.

### **CONCLUSION**

After a careful review of the record and pertinent law, the petition for writ of habeas corpus is DENIED.  The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED:  <u>September 5, 2007</u>

_____
JEFFREY S. WHITE
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

TEVAGA,

               Plaintiff,

  v.

MCGRATH et al,

               Defendant.

_____/

Case Number: CV04-02452 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on September 5, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Danny Toatele Tevaga P-72747
Salinas Valley State Prison
P.O. Box 1050
Soledad, CA 93960

Glenn R. Pruden
Attorney General's Office
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102

Dated: September 5, 2007

*Jennifer Ottolini*

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk